**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHRISTINE LEYDEN,** | |
| Plaintiff, | |
| v. | Case No. 1:14-cv-01118 (CRC) |
| **AMERICAN ACCREDITATION HEALTHCARE COMMISSION,** | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christine Leyden was terminated by the American Accreditation Healthcare

Commission ("URAC"), a private, non-profit organization that accredits healthcare plans and

providers.  She alleges she was fired after voicing concerns that new management was

mistreating female executives and that two URAC board members were engaged in conduct that

she thought jeopardized the organization's independence.  Leyden has brought suit to challenge

her termination, alleging gender discrimination and retaliation under federal and District of

Columbia laws; breach of implied contract and promissory estoppel based on the anti-retaliation

provisions of two URAC personnel policies; and wrongful discharge under the "public policy"

exception to the at-will employment doctrine.  URAC has moved to dismiss all of Leyden's

claims, arguing that it exercised its right to fire her as an at-will employee who disagreed with

the new direction of the organization.  Because Leyden has pled sufficient facts to support her

discrimination, retaliation, implied contract, and promissory estoppel claims, the Court will deny

URAC's motion as to those claims. The Court will grant URAC's motion to dismiss Leyden's

wrongful discharge claim, however, because she has not pled sufficient facts to support

application of the public policy exception to this case.

I.      **Background**

The following facts are drawn from Leyden's Amended Complaint and are taken as true

for the purpose of resolving this motion.  Defendant URAC is a tax-exempt organization that

offers accreditation and certification programs to managed care health plans, healthcare

providers, and pharmacies.  Am. Compl. ¶¶ 21–22.  More than 40 states, the District of

Columbia, and the federal government have "deemed" that URAC accreditation satisfies

eligibility requirements in numerous healthcare regulations, including requirements for

participation in the insurance exchanges created under the Affordable Care Act.  Id. ¶¶ 23, 25.  In

many states, URAC must accredit a managed care entity in order for it to receive an insurance

license.  Id. ¶ 34.

Leyden, a registered nurse with a master's degree in community nursing, joined URAC in

2000.  Before she was terminated, she had risen through the ranks to become Chief Accreditation

Officer, reporting directly to the Chief Executive Officer.  Id. ¶ 43.  In that capacity, Leyden

oversaw URAC's accreditation programs and standards.  Id.  Leyden did not have a formal

employment agreement.  Id. ¶ 45.

Leyden's suit is rooted in two sets of allegations.  First, in June 2012, URAC hired

William Vandervennet as its new Chief Operating Officer.  Id. ¶ 77.  Leyden had sought the

position but was passed over.  Id.  In the ensuing months, Leyden alleges that Vandervennet and

his newly-installed deputy, Vernon Rowen, reduced her job responsibilities by eliminating her

prior direct access to the board of directors.  Id. ¶ 86.  Leyden further alleges that they replaced

other female executives with younger men and denigrated and physically intimidated her and

other female executives who disagreed with them.  Id. ¶¶ 82, 89–90.  As a result, Leyden

contends, other women in the office complained to her about Vandervennet fostering an "Old

Boys' Network" environment.  Id. ¶ 93.  Those complaints, according to Leyden, prompted

URAC's human resources director to question Leyden as to whether she had described

Vandervennet in that manner.  Id. ¶ 94.  Leyden denied having used that particular term but told

the human resources director that she nonetheless agreed with the characterization.  Id. ¶ 95.

Second, Leyden contends that before she was fired she had raised concerns about what

she perceived as improper conduct on the part of two members of URAC's board, which is

drawn from companies in the managed care industry.  She alleges she complained that URAC's

board chair had sought improper access to business and financial information submitted to

URAC by managed care companies, id. ¶ 49, and attempted to influence URAC's accreditation

review of his company, UnitedHealth, id. ¶ 54.  She also alleges that she objected to the vice-

chair of the board's purported involvement in negotiations between URAC and her own

company over the terms of a potential contract to provide accreditation services.  Id. ¶ 107.

Leyden contends that the board members' conduct violated URAC's conflict of interest policy

and jeopardized the independence of its accreditation decisions.

Leyden was terminated in January 2013.  Id. ¶ 122.  She challenged the termination in a

timely charge with the Equal Employment Opportunity Commission and the D.C. Office of

Human Rights.  Id. ¶¶ 11, 12.  After receiving a notice of her right to sue, Leyden brought, and

later amended, this nine-count complaint.  Her amended complaint alleges gender discrimination

and retaliation under Title VII of the Civil Rights Act of 1964 ("Tile VII") and the District of

Columbia Human Rights Act ("DCHRA") (Counts 1, 2, 8, and 9); breach of implied contract and

promissory estoppel based on two URAC personnel policies (Counts 3, 4, 5, and 6); and

wrongful termination based on the "public policy" exception to the at-will employment doctrine

recognized by District of Columbia courts (Count 7).  URAC has moved to dismiss all of

Leyden's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on

which relief can be granted.  The Court held a hearing on the motion on January 21, 2015.

## II.      Legal Standards

A motion to dismiss must be granted if the allegations in the complaint do not "contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 570 (2007)).  In order to survive a motion to dismiss, the plaintiff must have alleged facts

that would establish the defendant's liability.  See Stokes v. Cross, 327 F.3d 1210, 1215 (D.C.

Cir. 2003).  Although the Court must accept the facts pled as true, legal allegations devoid of

factual support are not entitled to this assumption.  See Kowal v. MCI Commc'ns Corp., 16 F.3d

1271, 1276 (D.C. Cir. 1994).

## III.     Analysis

A.      Discrimination and Retaliation Claims (Counts 1, 2, 8, and 9)

Counts 1 and 8 of the amended complaint allege gender discrimination under Title VII

and the DCHRA.  Counts 2 and 9 allege unlawful retaliation under the same statutes.  To make

out a plausible claim of discrimination under Title VII or the DCHRA, a plaintiff must allege

that he or she has suffered an adverse employment action because of race, color, religion, sex, or

national origin.  See 42 U.S.C. § 2000e; Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d

793, 802 (D.C. 2003) (noting that DCHRA discrimination claims are analyzed according to Title

VII jurisprudence).  And to prove a retaliation claim, a plaintiff must establish that he or she (1)

opposed an unlawful employment practice; (2) the employer took a materially adverse personnel

action; and (3) a causal connection existed between the two.  McGrath v. Clinton, 666 F.3d 1377,

1380 (D.C. Cir. 2012); accord Howard Univ. v. Green, 652 A.2d 41, 45 (D.C. 1994) (noting that

Title VII case law is instructive for DCHRA retaliation claims).

URAC asserts that Leyden's allegations do not give rise to a plausible claim of gender

discrimination or retaliation.  It argues, in essence, that the treatment she allegedly received after

Vandervennet and Rowen joined the organization should be chalked up, not to discrimination,

but to the normal shifts in responsibilities that one would expect with a new management team.

Def.'s Mot. to Dismiss at 13.  But surely purges of female executives and verbal denigration and

physical intimidation of women—if true—are not the expected results of management changes.

Am. Compl. ¶¶ 83, 89–91.  Even if it is plausible that URAC fired Leyden as part of a legitimate

re-organization, it is also plausible, based on her factual allegations, that she was terminated

because of her gender.  URAC's motion to dismiss Counts 1 and 8 will be denied.

As for Leyden's retaliation claims, URAC argues she has not alleged she engaged in

protected activity because she did not affirmatively complain of gender discrimination; she

merely agreed with her female colleagues' characterization of Vandervennet and Rowen's

leadership as an "Old Boys' Network" in response to questioning by URAC's human resources

director.  Id. ¶ 95.  Not so.  An employee can oppose discrimination, as Leyden says she did

here, "by responding to someone else's question just as surely as by provoking the discussion."

Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 277 (2009).  In

any event, Leyden also alleges that she shared her concerns about discrimination directly with

Vandervennet.  Am. Compl. ¶ 95.  As a result, Leyden's allegations that URAC terminated her

less than two months after she engaged in protected conversations with the human resources

director and Vandervennet himself are sufficient to state valid claims of retaliation.  See Hopkins

v. Grant Thornton Int'l, 851 F. Supp. 2d 146, 153 (D.D.C. 2012), aff'd sub nom. Hopkins v.

Grant Thornton, LLP, 529 F. App'x 1 (D.C. Cir. 2013) ("The short period of time between his

protected activity and his termination lend support to the argument that the former was the basis

for the latter.").  URAC's motion to dismiss counts 2 and 9 will therefore be denied.

      B.      <u>Implied Contract and Promissory Estoppel Claims</u> (Counts 3, 4, 5, and 6)

Leyden acknowledges that she did not have a written employment contract with URAC.

Nevertheless, she argues in Counts 3 and 6 that URAC breached implied contracts arising under

two of its personnel policies when it terminated her.  She further alleges, in Count 5, that URAC

breached a covenant of good faith and fair dealing implicit in these contracts and, in Count 4,

that it is bound to fulfill the terms of one of the policies under a theory of promissory estoppel.

URAC retorts that the policies are not applicable to Leyden's alleged conduct and, in any event,

did not create implied contracts because URAC's employee handbook explicitly disclaims the

creation of any contractual rights.[1]  URAC further contends that Leyden was not protected by the

policies because she did not put her concerns in writing.

A plaintiff may rebut the D.C. law presumption of at-will employment by showing that

"the parties intended that termination be subject to specific preconditions."  <u>Strass v. Kaiser</u>

<u>Found. Health Plan</u>, 744 A.2d 1000, 1011 (D.C. 2000).  One way to do so is to show that the

terms of a personnel manual or employee handbook create contractual rights.  <u>Id.</u>  An employer

may disclaim that it is bound by the terms of those documents.  But if the disclaimer is

"rationally at odds" with other language in the document, a reasonable jury could conclude that

the employer intended to be bound by the substantive terms.  <u>Id.</u> at 1013–14.  Any implied

contract would also contain an implied duty of good faith and fair dealing, which requires "that

neither party shall do anything which will have the effect of destroying or injuring the right of

---

[1]  The disclaimer states:  "This Handbook is not a contract of employment, and does not confer
any contractual rights, either express or implied, between URAC and you."  Def.'s Mot. to
Dismiss Ex. 1.

the other party to receive the fruits of the contract." Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006) (citations omitted). Finally, even in the absence of a contract, an organization may be liable under a theory of promissory estoppel if a plaintiff establishes "(1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment." Myers v. Alutiiq Int'l Solutions, LLC, 811 F. Supp. 2d 261, 272 (D.D.C. 2011) (citing Simard v. Resolution Trust Corp., 639 A.2d 540, 552 (D.C. 1994)).

Leyden locates implied contracts in two URAC policies: a whistleblower policy and an employee grievance policy. URAC's whistleblower policy invites employees "to report allegations of known or suspected Improper Activities." Am. Compl. Ex. 3. "Improper Activities" are defined to include a non-exclusive series of specific acts, such as questionable accounting and fraud, as well as a catch-all category including "malfeasance" and "gross misconduct." Id. And most importantly, the policy concludes with an anti-retaliation provision: "No URAC employee who in good faith reports any Improper Activities in accordance with this policy shall suffer, and shall be protected from threats of harassment, retaliation, discharge, or other types of discrimination." Id.

Leyden's alleged complaints about a board member's requests for proprietary information—supplied to URAC by an accredited entity with the expectation that URAC would not share it with board members from competing managed care organizations—implicates URAC's whistleblower protections. In other words, conduct by board members in violation of an organization policy specifically designed to prevent breaches of confidentiality plausibly falls within the scope of the non-exclusive "Improper Activities" the whistleblower policy invites employees to report. And Leyden may be protected by the whistleblower policy, despite raising her concerns verbally, because it merely "encourage[s]"—but does not require—employees to

report improper activities in writing.  Id.  The Court further concludes that, to the extent the "at-will" disclaimer in the URAC employee handbook applies to the whistleblower policy (which is found in a different document), the handbook disclaimer is "rationally at odds" with the whistleblower policy and therefore does not serve to retract URAC's commitment to protect employees from retaliation for reporting suspected improper activity.  Strass, 744 A.2d at 101–14.  Any other conclusion would render the whistleblower policy meaningless.  Having made the promise, URAC cannot now argue it was not bound to honor it.

The same is true of URAC's grievance policy.  That policy encourages URAC employees to raise complaints or suggestions concerning their work conditions.  Like the whistleblower policy, it contains a non-retaliation provision promising that "[n]o employee will be penalized, formally or informally, for voicing a complaint with URAC in a reasonable, professional manner."  Am. Compl. Ex. 4.  Leyden alleges that she was fired for doing just that:  raising concerns about management's treatment of women and about conduct she thought undermined the integrity of the accreditation programs she oversaw.  Again, because the "at-will" disclaimer contradicts the grievance policy, it does not prohibit Leyden from seeking to enforce URAC's promise not to penalize employees for lodging reasonable complaints.

Accordingly, Leyden has adequately pled that URAC entered into implied contracts, along with the implicit covenant of good faith and fair dealing included in those contracts.  Allworth, 890 A.2d at 201.  She has also adequately pled, in the alternative, a valid claim for promissory estoppel based on the anti-retaliation provision of the whistleblower policy.  The Court therefore will deny URAC's motion to dismiss Counts 3, 4, 5 and 6.

C.      Wrongful Discharge Claim (Count 7)

That brings us to Count 7, alleging wrongful discharge.  As noted above, Leyden did not have an employment contract and therefore was presumed to be an at-will employee.  Under

8

District of Columbia law, at-will employees "may be discharged at any time and for any reason,

or for no reason at all." Liberatore v. Melville Corp., 168 F.3d 1326, 1329 (D.C. Cir. 1999)

(internal quotations omitted). "District of Columbia law thus presumptively bars wrongful

termination claims brought by at-will employees." Vreven v. Amer. Ass'n of Retired Persons,

604 F. Supp. 2d 9, 13 (D.D.C. 2009). Leyden seeks to rescue her claim by invoking a narrow,

common-law public policy exception to this rule. Carl v. Children's Hosp., 702 A.2d 159 (D.C.

1997). She argues that she opposed the board members' actions in order to protect the integrity

of URAC's quasi-public mission, including its role accrediting the healthcare plans offered on

the Affordable Care Act exchanges. Her termination, she contends, therefore implicates a

"serious public concern." Am. Compl. ¶ 176. URAC responds that Leyden has not identified a

public policy sufficiently rooted in a specific statute or regulation to qualify for the exception.

The Court agrees with URAC. The District of Columbia Court of Appeals first

recognized a limited public policy exception to the at-will employment doctrine in Adams v.

George W. Cochran & Co., 597 A.2d 28, 34 (D.C. 1991). The court held that an at-will

employee may bring a wrongful discrimination claim when "the sole reason for the discharge is

the employee's refusal to break the law." Id. The court expanded this exception somewhat in

Carl, holding that circumstances other than outright refusal to break the law could justify the

exception if the employee was fired after acting in furtherance of a public policy "solidly based

on a statute or regulation that reflects the particular public policy to be applied, or (if

appropriate) on a constitutional provision concretely applicable to the defendant's conduct." 702

A.2d at 163 (Terry, J., concurring). The plaintiff in Carl was a nurse who testified before the

District of Columbia Council on tort-reform legislation adverse to her employer's interests. A

D.C. law prohibited threatening witnesses who appear before the Council. A plurality of the

D.C. Court of Appeals read the law "as a declaration of policy by the Council seeking to ensure the availability of information essential to its legislative function by imposing criminal penalties on anyone who seeks to impede Council access to such information." Id. at 165.  The court recognized an extension of the public policy exception, concluding that there was a "close fit" between the termination and the policy embodied by the law because firing an employee is "the most severe and effective" way for an employer to dissuade a witness from testifying.  Id.

While it expanded the Adams doctrine beyond an employee's refusal to break the law, the court in Carl reiterated that the exception remained "very narrow." Id. at 161.  The plurality stressed that it applies only where the public policy in question is "solidly" based in a specific statute or regulation or where a constitutional provision "concretely" applies to the employer's conduct. Id. at 163.  It specifically declined to follow numerous other state courts that have adopted more expansive public policy exceptions. Id.  And lest the exception come to swallow the rule, the court urged future courts to consider arguments for any new exception only if they "reflect a clear mandate of public policy—i.e., those that make a clear showing, based on some identifiable policy that been 'officially declared' in a statute or municipal regulation, or in the Constitution, that a new exception is needed." Id. at 164.  The court also noted that the exception should require a "close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." Id.

Since Carl, District of Columbia courts and federal courts in this district have applied the public policy exception to a number of alleged retaliatory discharges, including those of employees who threatened to disclose a pharmaceutical company's violations of drug-storage regulations, Liberatore, 168 F.3d at 1327; exposed potential violations of a non-profit employer's tax-exempt status, Vreven, 604 F. Supp. 2d at 11; protested food contamination at a nursing

home, Washington v. Guest Servs., Inc., 718 A.2d 1071, 1072 (D.C. 1998); reported a bribe,

Fingerhut v. Children's Nat. Med. Ctr., 738 A.2d 799, 801 (D.C. 1999); and aided an

investigation into conduct prohibited by federal contracting regulations, Myers, 811 F. Supp. 2d

at 267.  The common denominator in all of these cases is the existence of specific laws or

regulations that clearly reflect a policy prohibiting the activity about which the employee

complained, whether or not the employer actually violated the law or regulation.

Leyden's invocation of the exception is more attenuated.  She attempts to root her claim

mainly in Section 1311 of the Affordable Care Act ("ACA").  That section, however, simply

requires states to establish healthcare exchanges where consumers can enroll in accredited plans.

42 U.S.C. § 18031.  It does not set out a standard of conduct for accreditation providers.  So,

while URAC's role in certifying healthcare plans for ACA-mandated exchanges may well be

important and deserving of protection, the ACA does not embody a specific public policy

prohibiting URAC's board members from engaging in the conduct Leyden alleges.  Leyden also

argues that federal contracting regulations prohibit retaliation against employees who expose

conflicts in connection with government contracts, see 48 C.F.R. § 3.903, and that criminal

statutes prohibit conflicts of interest on the part of government employees, see 18 U.S.C. § 208.

She contends that the policies reflected in those regulations and statutes are appropriate grounds

for the public policy exception given URAC's quasi-public role in the accreditation of healthcare

plans and providers.  But despite URAC's role, it is neither a government contractor nor a

government agency.  And the Court is not aware of any federal or local anti-retaliation law or

regulation that would prohibit the termination of a private-sector employee for raising concerns

about board conduct under the circumstances presented here.  Leyden has not established the

11

"close fit" required by the D.C. Court of Appeals to recognize a new public policy exception.

Accordingly, the Court will grant URAC's motion to dismiss Count 7.

## IV.     Conclusion

For the foregoing reasons, it is hereby

**ORDERED** the Defendant's Motion to Dismiss [ECF No. 12] is GRANTED in part and

DENIED in part.  It is further

**ORDERED** that Count 7 of the Amended Complaint is Dismissed.

**SO ORDERED.**

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 18, 2015